UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROCKY MOUNTAIN MEDICAL MANAGEMENT, LLC and TERRY ELQUIST, | Case No. 4:13-cv-00064-EJL |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER |
| vs. | |
| LHP HOSPITAL GROUP, INC.; PORTNEUF HEALTH CARE FOUNDATION; LHP MANAGEMENT SERVICES, LLC; POCATELLO HOSPITAL, LLC; POCATELLO HEALTH SYSTEM, LLC; POCATELLO HEALTH SERVICES, LLC; LHP POCATELLO, LLC; LHP HOSPITAL PARTNERS, INC.; NORMAN STEPHENS and JOHN ABREU, | |
| Defendants. | |

This matter is before the Court on three motions to Dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6) filed by Defendants LHP Hospital Group,

Inc., Norman Stephens and John Ambreu ("First Motion to Dismiss") (Dkt. 4),

Portneuf Health Care Foundation, Inc., Pocatello Hospital, LLC, Pocatello Health

System, LLC, Pocatello Health Services, LLC, and LHP Pocatello, LLC ("Second

Motion to Dismiss") (Dkt. 16), and LHP Management Services, LLC and LHP

Hospital Partners, Inc. ("Third Motion to Dismiss") (Dkt. 25) (collectively referred

MEMORANDUM DECISION AND ORDER - 1

60213.0002.5717306.1

to hereinafter as "Defendants' Motions to Dismiss"). Also pending before the Court are a Motion to Quash or for Protective Order by Skyline Surgery Center, LLC, a nonparty to this action (Dkt. 7), and Defendants' Motion to Strike Plaintiff's Supplemental Memorandum regarding the status of Defendant LHP Hospital Partners, Inc. (Dkt. 32.) Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

For the reasons stated below, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' Motions to Dismiss. Given the Court's finding that Defendant LHP Hospital Partners, Inc., should be dismissed from this action, Defendants' Motion to Strike Plaintiff's Supplemental Memorandum regarding the status of Defendant LHP Hospital Partners, Inc., is **MOOT**. Finally, pursuant to this Court's April 3, 2013 Order (Dkt. 19) regarding Skyline Surgery Center's Motion to Quash or for a Protective Order, the original Defendants shall have until twenty-one days from the date this decision is entered to respond to Skyline's Motion.

60213.0002.5717306.1

## I.    Factual Background[1]

Plaintiff Terry Elquist ("Elquist") was an owner and administrator of the Rocky Mountain Surgery Center, LLC ("RMSC") an ambulatory surgery center doing business in Pocatello, Idaho.  Elquist also owned and operated a consulting company, Plaintiff Rocky Mountain Medical Management, LLC, ("RMMM") as a sole proprietorship.  RMMM provided medical practice management and billing services to and for medical doctors.  Since 2004, one of RMMM's clients was Anesthesia Associates of Pocatello, P.A ("Anesthesia Associates").  Anesthesia Associates has an exclusive contract with one or more of the Defendants to provide anesthesia services at Portneuf Medical Center ("PMC").

In 2009, one or more of the Defendants purchased RMSC.  Although Defendants knew Elquist also owned and operated RMMM, they were not interested in purchasing RMMM at the time they purchased RMSC.  As a part of Defendants' purchase of RMSC, Elquist became an employee of PMC.  Elquist continued to operate RMMM while he was employed at PMC.  Elquist remained an employee of PMC until August 2011, when he voluntarily terminated his employment.

---

[1] Unless otherwise noted, all facts are taken from Plaintiffs' Second Amended Complaint (Dkt. 1-71).  The Court must accept as true all of the factual allegations contained in a complaint when deciding a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

60213.0002.5717306.1

In September 2011, Elquist began pursuing the idea of developing a surgery center in Pocatello, Idaho which would "provide more efficient and less-costly outpatient surgical services in Pocatello and compete with the Defendants and their operation of [PMC]." (Dkt. 1-71, ¶15.) Elquist discussed having Anesthesia Associates provide exclusive anesthesia services for the new center, and Anesthesia Associates initially supported and encouraged Elquist's efforts to develop a new surgery center. Elquist also obtained commitments from doctors, dentists and podiatrists to participate in the development of the new surgery center, and maintains that the general response to the idea of a new surgery center was "overwhelmingly favorable." (*Id.*, ¶¶17, 38.)

On January 26, 2012, Elquist met with partners of Anesthesia Associates and was advised that they were being pressured by Norman Stephens ("Stephens"), Chief Executive Officer of PMC, and John Abreu ("Abreu"), Chief Financial Officer of PMC, to terminate their contract with RMMM or suffer the loss of Anesthesia Associates' exclusive contract to provide anesthesia services at PMC. Anesthesia Associates thereafter delivered an ultimatum to Elquist demanding that he either cease involvement with the development of a new surgery center or suffer termination of RMMM's contract with Anesthesia Associates. Anesthesia Associates initially gave Elquist two weeks to decide whether to stop his plans to develop the new surgery center.

MEMORANDUM DECISION AND ORDER - 4

On January 27, 2012, Elquist met, in his capacity as practice manager for Anesthesia Associates under the Anesthesia Associates/RMMM contract, with Stephens and Abreu to discuss Anesthesia Associates' contracts at PMC.  During this meeting Stephens advised Elquist that it was his intent to stop the development of any competing surgery center, and that neither Elquist, nor any of his family members, could operate both RMMM and a new surgery center.  Stephens and Abreu also told Elquist that he would have until the end of the month to make a decision.  Because Anesthesia Associates had given Elquist two weeks to decide, Elquist assumed Stephens and Abreu meant that he had until the end of February 2012 to make a decision regarding moving forward with the surgery center.

On February 13, 2012, Anesthesia Associates hand delivered an ultimatum to Elquist demanding:

> that you and any entity that you have or contemplate having any interest in cease any and all activity that may be perceived as competing with the business of [Anesthesia Associates] and its physicians.  This includes, but is not limited to pursing the establishment of a competing surgery center within 100 miles of Pocatello, Idaho, recruiting PMC affiliated physicians to practice in non PMC related facilities, and any other practice which may be deemed detrimental to [Anesthesia Associates'] business.

> Your formal decision must be in writing and must be received by [Anesthesia Associates] by 4:00 p.m. on Friday, February 17, 2012.  If written notice of your decision to abide by the terms delineated in the preceding paragraph is not received by said date, then please consider this letter as written notice by [Anesthesia Associates] to terminate it's [sic] relationship with RMMM 61 days from Feb. 17, 2012.

(Dkt. 1-3, Ex. A.)

60213.0002.5717306.1

A copy of the letter was sent to Stephens.  As a new surgery center would allegedly provide more opportunity for Anesthesia Associates, but would compete with PMC, Elquist alleges Anesthesia Associates' February 13, 2012 letter "was essentially a ghost-written demand and threat orchestrated by the [PMC] to protect it from efficient and cost-saving competition."  (Dkt. 1-71, ¶24.)  Elquist thereafter inquired why the deadline for his decision had been moved up, and was told by Dr. John Traul, one of the partners in Anesthesia Associates, "because [PMC] pressured us to move the deadline up."  (*Id*., ¶25.)  When Elquist's subsequent attempts to work out a solution with Anesthesia Associates were unsuccessful, Anesthesia Associates terminated its contract with RMMM by letter dated March 7, 2012.  The March 7 letter reiterated that RMMM's contract was being terminated due to Elquist's refusal to "cease any activity that would involve the establishment of the competing surgery center," and terminated the Anesthesia Associates/RMMM contract effective April 20, 2012.  (*Id*., ¶26.)

## II.  Procedural Background

On March 30, 2012, Elquist and RMMM (collectively referred to hereinafter as "Plaintiffs") filed a Verified Complaint and Demand for Jury Trial in Bannock County, Idaho.  (Dkt. 1-3.)  Plaintiffs' state court case alleged tortious interference with contract and prospective economic advantage, and unreasonable restraint of trade against Defendants LHP Hospital Group, Inc. ("LHP Hospital Group"),

MEMORANDUM DECISION AND ORDER - 6

Stephens and Abreu (collectively referred to hereinafter as the "original Defendants"). (*Id.*, pp. 6-7.) The original Defendants filed a Motion to Dismiss, alleging that Plaintiffs' complaint failed to plead the requisite elements of tortious interference and of an antitrust claim under the rule of reason standard. (Dkt. 1-31, p. 3.) Plaintiffs responded with an amended verified complaint including claims for tortious interference with contract, two counts of intentional interference with a prospective economic advantage (as to the surgery center and RMMM), unreasonable restraint of trade in violation of Idaho code, and unlawful monopoly or intent to monopolize in violation of Idaho code. (*Id.*) The original Defendants filed a new motion to dismiss each claim, arguing that Plaintiffs lacked standing to assert, and failed to plead the requisite elements of, their antitrust claims, and that Plaintiffs failed to plead the requisite elements of their tortious interference claims.

The state court granted the original Defendants' motion with respect to Plaintiffs' unreasonable restraint of trade claim, finding Plaintiffs failed to adequately plead actual injury to competition. (*Id.*, p. 19.) The court denied original Defendants' motion with respect to Plaintiffs' three tortious interference claims and unlawful monopoly or intent to monopolize claim. In so holding, the court analyzed Plaintiffs' tortious interference claims under the pleading requirements provided by the Idaho Rules of Civil Procedure, but reviewed Plaintiffs' antitrust claims under the heightened federal pleading requirements

60213.0002.5717306.1

emphasized by the United States Supreme Court in *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  (*Id.*, pp. 4-7, 15-16.)

After ruling on the original Defendants' motion to dismiss on August 22, 2012, Idaho Sixth District Judge Stephen S. Dunn ("Judge Dunn") postponed entering a scheduling order to allow Plaintiffs more time to assess whether to seek leave to again amend their complaint in order to name additional defendants.  (Dkt. 1-42.)  Plaintiffs were ultimately given until February 1, 2013 to determine whether to seek leave to amend or to proceed with their First Amended Complaint. (Dkt. 1-62.)  On February 1, 2012, Plaintiffs filed a Second Amended Complaint without first seeking leave to do so.  (Dkt. 4-1, p. 4; Dkt. 1-71).  Plaintiffs' Second Amended Complaint ("SAC") added seven new defendants, invoked federal antitrust laws in addition to state antitrust laws, and included new factual allegations.  (*Compare* Dkt. 1-24 *with* Dkt. 1-71.)  The SAC also included Plaintiffs' previously-dismissed claim for unreasonable restraint of trade. Defendants chose to consent to the amended complaint's filing rather than seek denial of leave to amend.  (Dkt. 1-72.)  However, because the SAC asserted claims

60213.0002.5717306.1

under federal antitrust law, Defendants then removed the action to federal court.[2]

(Dkt. 1-73.)

The original Defendants filed the First Motion to Dismiss for failure to state a claim on February 15, 2013.  (Dkt. 4.)  Once the seven newly added defendants, Portneuf Health Care Foundation, Inc., LHP Management Services, LLC, Pocatello Hospital, LLC, Pocatello Health System, LLC, Pocatello Health Services, LLC, LHP Pocatello, LLC, and LHP Hospital Partners, Inc., (collectively referred to hereinafter as "newly added Defendants") were served, five filed the Second Motion to Dismiss on April 2, 2013 (Dkt. 16), and the remaining two filed the Third Motion to Dismiss on April 17, 2013 (Dkt. 25).[3]  Plaintiffs filed a joint-

---

[2] At the time Defendants removed the case to this Court, a Motion to Quash Subpoena or for Protective Order ("Motion to Quash") by nonparty Skyline Surgery Center, LLC ("Skyline") was pending before Judge Dunn.  Skyline entered the pending Motion to Quash in this Court on February 8, 2013.  (Dkt. 7.)   Skyline is an ambulatory surgery center expanding to Bannock County in 2013.  In its Motion to Quash, Skyline seeks protection from a subpoena duces tecum it received from the original Defendants during the course of discovery in the state court action.  This Court entered an order on April 3, 2013 (Dkt. 19) extending the original Defendants' response deadline to Skyline's Motion to Quash until twenty-one days after Defendants' motions to dismiss are decided.  If the Court grants Defendants' Motions to Dismiss, Skyline would not be subject to the subpoena duces tecum and its Motion to Quash would be moot.  However, because the Court is denying Defendants' Motions to Dismiss in part, the original Defendants now have twenty-one days from the date of this order to respond to Skyline's motion.

[3] With the exception of Plaintiffs' failure to allege any facts to establish liability of the various newly added defendants, the Second and Third Motion to Dismiss raise the same arguments as Defendants' First Motion to Dismiss.

60213.0002.5717306.1

response to Defendants' motions on April 26, 2013.  (Dkt. 28.)  The original and newly added Defendants then filed a joint-reply to Plaintiffs' response.[4]  (Dkt. 29.)

In addition to refuting Plaintiffs' response brief, Defendants' joint-reply also argued Plaintiffs failed to address the newly added Defendants' argument, in the Third Motion to Dismiss, that Defendant LHP Hospital Partners, Inc. ("LHP Hospital Partners"), does not exist and was not properly served.  (*Id.*, p. 10.) Defendants suggested pursuant to Idaho Local Rule 7.1(e)(1), Plaintiffs accordingly conceded that Defendant LHP Hospital Partners should be dismissed. Plaintiffs responded with a supplemental memorandum refuting Defendants' claim that LHP Hospital Partners does not exist. (Dkt. 30.)  Defendants thereafter filed a Motion to Strike Plaintiffs' supplemental memorandum as an unauthorized sur-reply.  (Dkt. 32.)

### III.    Standard of Review

A motion to dismiss for failure to state a claim challenges the legal sufficiency of the claims stated in the complaint.  *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011).  To sufficiently state a claim to relief and survive a 12(b)(6) motion, the pleading "does not need detailed factual

---

[4] Unless otherwise specified, the original and newly added Defendants will be collectively referred to hereinafter as the "Defendants."

MEMORANDUM DECISION AND ORDER - 10

allegations," however, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id*.  Rather, there must be "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556.  The plausibility standard is not akin to a "probability requirement," but does require more than a sheer possibility that a defendant acted unlawfully. *Id*.

In *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the Supreme Court identified two "working principals" that underlie *Twombly*.  First, although a court must accept as true all factual allegations in a complaint when ruling on a motion to dismiss, the court need not accept legal conclusions as true. *Id*.  "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 678-79.  Second, only a complaint that states a plausible claim for relief will survive a motion to dismiss. *Id*. at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

MEMORANDUM DECISION AND ORDER - 11

In light of *Twombly* and *Iqbal*, the Ninth Circuit summarized the governing

standard as follows:  "In sum, for a complaint to survive a motion to dismiss, the

nonconclusory factual content, and reasonable inferences from that content, must

be plausibly suggestive of a claim entitling the plaintiff to relief."  *Moss v. U.S.*

*Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).  Apart from factual insufficiency, a

complaint is also subject to dismissal under Rule 12(b)(6) where it lacks a

cognizable legal theory, *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th

Cir. 1990), or where the allegations on their face show that relief is barred for a

legal reason.  *Jones v. Bock*, 549 U.S. 199, 215 (2007).

## IV.    Analysis
### A.  Tortious Interference Claims

In both their First Amended Complaint before Judge Dunn ("FAC"), and in

the SAC, Plaintiffs raised a tortious interference with contract claim against

Defendants[5] for interfering with RMMM's contract to provide medical

management services to Anesthesia Associates.  Count two of both complaints

alleges tortious interference with Elquist's prospective economic interest in

developing the surgery center, and count three of both complaints alleges tortious

interference with RMMM's prospective economic interest in its continued

---

[5] Other than the original Defendants, the SAC does not specify which of the newly added
Defendants interfered with RMMM's contract with Anesthesia Associates, or with
either RMMM's or Elquist's prospective economic advantage.

MEMORANDUM DECISION AND ORDER - 12

relationship with Anesthesia Associates.  The state court determined Plaintiffs

adequately plead the elements of such claims, and denied Defendants' motion to

dismiss counts one through three.  However, Judge Dunn analyzed Plaintiffs'

interference claims under the Idaho Rules of Civil Procedure, which require less

particularity in pleading than the Federal Rules of Civil Procedure.   As the

Supreme Court has stated, "once a case has been removed to federal court, it is

settled that federal rather than state law governs the future course of proceedings,

notwithstanding state court orders issued prior to removal."  *Granny Goose Foods,*

*Inc. v. Teamsters*, 415 U.S. 423, 437 (1974).  The "Federal Rules of Civil

Procedure, like other provisions of federal law, govern the mode of proceedings in

federal court after removal."  *Id*. at 438.  The Court will accordingly consider

Plaintiffs' tortious interference claims under the heightened federal pleading

standards.

    1.   *Count One-Tortious Interference with Contract*
    A prima facie case of tortious interference with contract requires a plaintiff

to prove:

> (a) the existence of a contract; (b) knowledge of the contract on the part of
> the defendant; (c) intentional interference causing a breach of the contract;
> and (d) injury to plaintiff resulting from the breach.[6]

------------------------------------------------

[6] Once a plaintiff has established a prima facie case for tortious interference with
contract, the burden is on the defendant to prove justification or privilege.  *Id*. at
284.

MEMORANDUM DECISION AND ORDER - 13

*Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 283-84 (1991) (hereinafter "*Bliss*") (*citing Barlow v. Int'l Harvester Co.*, 95 Idaho 881, 893 (1974)).

For the purposes of Defendants' motions to dismiss, the Court finds Plaintiffs have adequately alleged the existence of a Medical Management Services Agreement ("Management Services Contract") between RMMM and Anesthesia Associates.  (Dkt. 4-3.)  Plaintiffs have also established that the original Defendants knew about the Management Services Contract.  Plaintiffs have alleged that the original Defendants intentionally interfered by pressuring Anesthesia Associates to terminate the Management Services Contract with RMMM unless Plaintiffs abandoned any effort to develop a competing surgery center in Pocatello. Plaintiffs have also alleged that RMMM lost the Management Services Contract with Anesthesia Associates as a result of Defendants' interference, and suffered damages as a result of this loss.  The legal question is thus whether Defendants' interference caused Anesthesia Associates to breach the Management Services Contract with RMMM.  *Bliss*, 121 Idaho at 284 (under Idaho law, the tort of interference with contract requires an "intentional interference *causing a breach* of the contract") (emphasis in original).

---

60213.0002.5717306.1

In their initial motion to dismiss before Judge Dunn, Defendants argued that the court should infer the Management Services Contract was "terminable at-will," and that Defendants could thus not be liable for causing a breach by virtue of Anesthesia Associates' termination of the contract.  Stated another way, because Anesthesia Associates could terminate the Management Services Contract for any reason, Defendants' interference did not cause Anesthesia Associates to breach the Management Services Contract when they terminated based on Elquist's refusal to cease developing the surgery center.  However, the state court did not have the Management Services Contract before it, and determined that it must draw any inference as to the contract's terms in favor of Plaintiffs.  (Dkt. 1-31, p. 8.)

Following removal to this Court, Defendants attached the Management Services Contract as Exhibit A to their First Motion to Dismiss.[7]  (Dkt. 4-3.)

---

[7] Defendants obtained a copy of the Medical Management Services Contract from attorney Curt Thomsen, who represented Anesthesia Associates in connection with subpoenas issued by Plaintiffs to Anesthesia Associates' physicians and other personnel while this action was pending in state court.  (Dkt. 4-2.)  Although, when ruling on a motion to dismiss, the court must generally convert a Rule 12(b)(6) motion into one for summary judgment under Rule 56 if the court considers evidence outside of the pleadings,  a court may consider certain materials, such as documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice, without converting the motion to dismiss into one for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 907-908 (9th Cir. 2003).  As the Management Services Contract is referenced throughout the SAC, and forms the basis of Plaintiffs' interference with contract claim, the Court will consider the agreement without converting Defendants' motions to dismiss into motions for summary judgment.  *Id*. at 908.

MEMORANDUM DECISION AND ORDER - 15

Section seven of the Management Services Contract provides, "[t]his agreement may be terminated by either party with 60 days written notice." (*Id.*)  The Management Services Contract is accordingly terminable at-will.  Although Judge Dunn inferred the agreement was not terminable at-will, he also stated:

> Even if the contract, in this case, between Plaintiffs and [Anesthesia Associates], was terminable at will, a fact not yet established, the Idaho Supreme Court has held: "Liability may arise for tortious interference with a contract even where the contract is terminable at will because, until it has been terminated by one party, the contract is valid and subsisting and a defendant may not improperly interfere with it."

(Dkt. 1-31, p. 9) (*citing Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 895 (2010) (hereinafter "*Wesco*").

Although the *Wesco* court noted that tortious interference may arise for interference with a contract even where the contract is terminable at-will, the court appeared to limit this holding to whether the contract at issue was breached in some way other than by virtue of the contract's termination.  *Id.*  Because there was no evidence in the record to establish the employees at issue breached their employment contract with Wesco, and because termination of the employment contract could not itself be considered a breach given the employees' at-will status, the *Wesco* court affirmed the district court's finding that Wesco could not maintain a cause of action against defendant competitor for interference with the employment contracts.  *Id.*

MEMORANDUM DECISION AND ORDER - 16

Although it did not find a breach by virtue of the employees' termination of their employment contract, the *Wesco* court also noted:

> Here the district court found that, because the employees were at-will, they could terminate their employment at any time and for any reason without breaching their employment contracts.  We agree and find that the district court did not err in its determination that the employees did not breach their employment contracts by terminating their employment with Wesco. However, we still must consider whether the employees breached the covenant of good faith and fair dealing or their fiduciary duties toward Wesco.

*Id*. at 891.

Judge Dunn also emphasized that the covenant of good faith and fair dealing may be violated when a party nullifies or significantly impairs any benefit of a contract. (Dkt. 1-31, p. 9).  In denying Defendants' motion to dismiss Plaintiffs' interference with contract claim, Judge Dunn noted that Plaintiffs had alleged Defendants' interference caused Anesthesia Associates to breach the covenant of good faith and fair dealing implied in the Management Services Contract, and determined Plaintiffs had sufficiently complied with the pleading requirements to establish interference with contract.  (*Id*., p. 10.)

Idaho law recognizes a cause of action for breach of an implied covenant of good faith and fair dealing, even where a contract is terminable at-will.  *Wesco*, 149 Idaho at 891 (*citing Cantwell v. City of Boise*, 146 Idaho 127, 135 (2008); *see also Bliss*, 121 Idaho at 289 ("[g]ood faith and fair dealing are implied obligations of every contract") (citation omitted); *Metcalf v. Intermountain Gas Co*., 116 Idaho

MEMORANDUM DECISION AND ORDER - 17

622, 627 (1989) ("[a]ny action by either party which violates, nullifies or significantly impairs any benefit of the employment contract is a violation of the implied-in-law covenant.").  However, Idaho law is also clear that a covenant of good faith and fair dealing cannot be implied which is "contrary to the terms of the contract negotiated and executed by the parties."  *Bliss*, 121 Idaho at 288 (*citing First Security Bank of Idaho v. Gaige*, 115 Idaho 172 (1988); *Clement v. Farmers Ins. Exchange*, 115 Idaho 298 (1988)).  Although an implied covenant of good faith and fair dealing requires "'that the parties perform in good faith the obligations imposed by their agreement,'" the covenant cannot override an express provision in a contract.  *Bliss*, 121 Idaho at 288 (citations omitted).  As the *Bliss* court noted, "by merely standing upon the terms of a contract, a party does not fail to deal honestly with another party regardless of how onerous the terms of that contract may be ….  There is no basis for claiming implied terms contrary to the express rights contained in the parties' agreement." *Id*. at 288-289 (internal quotation and citations omitted).  Perhaps due to the less stringent pleading requirements of the Idaho civil rules, Judge Dunn appears to have accepted at face value Plaintiffs' claim that Defendants' interference caused Anesthesia Associates to breach the covenant of good faith and fair dealing implied in the Management Services Contract.  However, Anesthesia Associates could not breach the implied covenant of good faith and fair dealing simply by terminating the Management

MEMORANDUM DECISION AND ORDER - 18

Services Contract because the express terms of the contract allowed for termination at-will.

Other than Anesthesia Associates' termination of the contract, which cannot be considered bad faith due to the at-will provision, Plaintiffs have not alleged any facts to support a finding that Anesthesia Associates violated the covenant of good faith and fair dealing.  Further, Plaintiffs have also failed to identify any breach of the Management Services Contract by Anesthesia Associates.  To state a plausible claim for tortious interference with contract, a party must allege intentional interference *causing a breach of the contract*.  *Id*., at 283-84 (emphasis in original) (*citing Barlow v. Int'l Harvester Co*., 95 Idaho 881, 893 (1974)).  Because Anesthesia Associates' termination of the contract cannot itself be considered a breach given the contract's at-will provision, and because Plaintiffs have not identified any other facts to support a finding of breach of contract or breach of the covenant of good faith and fair dealing, Plaintiffs have failed to plead the requisite elements of tortious interference with contract.[8]  Plaintiffs' claim for tortious

------------------------------------------------------------

[8] A dismissal without leave to amend is improper unless it is clear that the complaint "could not be saved by any amendment."  *Harris v. Amgen, Inc*., 573 F.3d 728, 737 (9th Cir. 2009).  It does not appear that Plaintiffs could amend their complaint to adequately allege tortious interference with contract given the at-will provision of the Management Services Contract and Plaintiffs' failure to identify any breach of either an express or implied term of that agreement despite having filed three versions of their complaint.  Plaintiffs' interference with contract claim is accordingly dismissed with prejudice.

MEMORANDUM DECISION AND ORDER - 19

interference with contract must accordingly be dismissed.  *Zoellner v. St. Luke's Regional Medical Center*, --- F.Supp.2d---, 2013 WL 1314079, at *7 (D. Idaho 2013) (Idaho law does not recognize a claim for tortious interference with contractual relations where plaintiff alleges contractual interference with at-will employees) (*citing Bliss*, 121 Idaho 266).

   *2.  Count Two-Intentional Interference with Prospective Economic Advantage (Elquist)*

   Defendants contend Elquist's intentional interference with prospective economic advantage claim must be dismissed because Elquist has not alleged how Defendants interference with RMMM, a medical management services company, caused Elquist to lose his economic expectancy in developing a surgery center. The elements of a cause of action for interference with prospective economic advantage are:

> (1)  [T]he existence of a valid economic expectancy; (2) knowledge of the expectancy on the part of the interferer; (3) intentional interference inducing termination of the expectancy; (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted.

*Wesco*, 149 Idaho at 893.

   As Defendants note, to state a claim for interference with prospective economic advantage Elquist must establish, among other things, that the alleged

MEMORANDUM DECISION AND ORDER - 20

interference caused him to lose the economic expectancy associated with developing a surgery center.  (Dkt. 4-1, p. 16) (*citing Cantwell v. City of Boise*, 146 Idaho 127, 138 (2008) (intentional interference "inducing termination of the expectancy" is a required element).  Defendants suggest Elquist's causation allegation is impermissibly pleaded as a legal conclusion, and that there is no causal-link between the alleged wrong (inducing termination of the Management Services Contract) and the alleged harm (Elquist's inability to develop a surgery center).  (*Id.*)  Defendants made the same argument before the state court.  Judge Dunn concluded:

> Although Elquist has not pled with great particularity how [Anesthesia Associates'] termination of the RMMM contract affected his economic expectancy in the surgery center, such particularity is not required and it can easily be inferred from the alleged facts that harming or threatening to harm Elquist's financial interests in RMMM, could injure Elquist to such an extent that his plans for the surgery center could be thwarted as well.  As this is a motion to dismiss, Elquist is not required to support his allegations with evidence, but merely state a claim and allege facts upon which relief may be granted, with the court drawing every reasonable intendment in favor of the non-moving party.

(Dkt. 1-31, pp. 11-12.)

Defendants here contend that Judge Dunn allowed Elquist's interference claim to survive dismissal because he applied "Idaho's looser pleading standards," and concluded "causation could be inferred."  (Dkt. 4-1, p. 17.)  Although, when deciding whether to dismiss a complaint, a court need not accept legal conclusions as true, a claim "has facial plausibility when the plaintiff pleads factual content that

MEMORANDUM DECISION AND ORDER - 21

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.  The SAC alleges Stephens advised Elquist on January 27, 2012 that it was Stephens' intent "to stop the development of any competing surgery center" and that "neither [Elquist] nor any of his family members could continue to operate both [RMMM] and the surgery center." (Dkt. 1-71, ¶21.)  The SAC also alleges Defendants illustrated their ability to follow through with this threat when they successfully pressured Anesthesia Associates to terminate the Management Services Contract with RMMM, Elquist's company.  (*Id.*, ¶¶19-26.)  In light of these allegations, it is reasonable to infer Elquist was delayed in developing the surgery center because he lost the revenue associated with having Anesthesia Associates as an RMMM client due to Defendants' interference.  It is also reasonable to infer Elquist was delayed or stopped from opening the surgery center because such interference demonstrated Defendants had both the intent and the ability to persuade other medical practices to either end their relationship with RMMM or to refuse to support Elquist's proposed surgery center.  As Judge Dunn noted, "[d]elaying the opening of a business enterprise certainly qualifies as interference, and could even be a 'termination' of the economic expectancy that Elquist had hoped for during any period that the business enterprise failed to operate due to Defendants' alleged interference." (Dkt. 1-31, p. 12.)  The Court finds at this stage of the proceedings

60213.0002.5717306.1

that the SAC alleges a plausible basis for wrongful interference with Elquist's

economic expectancy in developing the surgery center.  Defendants' Motion to

Dismiss Count Two of the SAC is accordingly denied.

> 3. *Count Three-Interference with Prospective Economic Advantage*
>    *(RMMM)*

The SAC's third cause of action is for intentional interference with

RMMM's prospective economic advantage in continuing to provide medical

practice management and billing services to Anesthesia Associates.[9]  (Dkt. 1-71,

¶45.)  Defendants suggest RMMM has failed to establish Defendants' interference

was "wrongful by some measure beyond the fact of the interference itself."  (Dkt.

4-1, p. 19).  To establish interference was wrongful, a plaintiff must provide proof

that either: "(1) the defendant had an improper objective or purpose to harm the

plaintiff; or (2) the defendant used wrongful means to cause injury to the

prospective business relationship."  *Bliss*, 121 Idaho at 286.  The SAC alleges the

─────────────────────

[9] Although Count Three is based on the termination of RMMM's business relationship
with Anesthesia Associates, Elquist appears to assert the claim along with RMMM.
(Dkt. 1-71, ¶¶50-51.)  In the First Motion to Dismiss, Defendants argued Elquist
failed to identify a business relationship between Elquist and Anesthesia Associates
(as opposed to between RMMM and Anesthesia Associates) and that Count Three
must accordingly be dismissed as to Elquist.  (Dkt. 4-1, p. 21.)  Plaintiffs clarified in
their Joint-Response, "Mr. Elquist pleads in Count Two that the Defendants interfered
with his prospective economic advantage in developing a new surgery center;
RMMM pleads in Count Three that the Defendants interfered with its prospective
economic advantage in continuing the management services contract with [Anesthesia
Associates]."  (Dkt. 28, p. 17.)  The Court will accordingly analyze Count Three as
RMMM's claim for interference with its prospective economic advantage in
continuing the Management Services Contract.

60213.0002.5717306.1

intentional interference by Defendants "was wrongful because it was done with the intent and purpose of interfering with the contract rights of [RMMM] and/or . . . running one or both [RMMM] and/or the new surgery center out of business to eliminate competition against Defendants at [PMC]."  (Dkt. 1-71, ¶49.) Defendants suggest Plaintiffs cannot establish improper purpose because the Management Services Contract was at-will and because eliminating a potential competitor "is a valid business objective, except to the extent doing so in the particular circumstances would violate the law (such as the antitrust laws)."  (Dkt. 4-1, p. 21.)

When inducing termination of a contract terminable at-will, one who interferes will not be found to have an improper purpose if certain conditions are met.  Specifically:

> One who intentionally causes a third person . . . not to continue an existing contract terminable at will does not improperly interfere with the other's relation if (a) the relation concerns a matter involved in the competition between the actor and the other[,] (b) the actor does not employ wrongful means [,] (c) his action does not create or continue an unlawful restraint on trade [,] and (d) his purpose is at least in part to advance his interest in competing with the other.

*Quality Resource & Services, Inc. v. Idaho Power Co*., 706 F.Supp.2d 1088, 1102 (D. Idaho 2010) (*quoting Restatement (Second) of Torts* § 768 (1979)).

Defendants do not satisfy the aforementioned conditions because the relationship they interfered with, that between RMMM and Anesthesia Associates, does not concern a matter of competition between Defendants and RMMM.

MEMORANDUM DECISION AND ORDER - 24

Defendants operate PMC surgery center.  PMC is not in competition with RMMM, a provider of medical management and billing services.  Moreover, as the business Defendants diverted from RMMM, medical management of Anesthesia Associates, did not relate to the competition between Defendants and a proposed surgery center, Defendants cannot claim their interference was proper by virtue of a legitimate business interest in competition.  As Judge Dunn emphasized:

> Since Defendants have not asserted that they had any business stake related to whom [Anesthesia Associates] contracted for medical management services, Defendants' alleged actions in encouraging the discontinuance of the contract cannot be explained away by mere action consistent with legitimate business interests.  Rather, the Court may properly infer from Plaintiffs' pleadings that Defendants' purpose in the interference with the contract was to harm RMMM to the extent of driving it out of business[.]

(Dkt. 1-31, p. 13.)

Judge Dunn accordingly determined Plaintiffs had provided sufficient facts to establish Defendants acted with an improper purpose when interfering with RMMM's prospective economic advantage in a continued relationship with Anesthesia Associates. (Dkt. 1-31, p. 14.)  This Court also finds Plaintiffs have sufficiently alleged facts to support the inference that Defendants acted with an improper purpose when interfering with the Management Services Contract.

Further, in *Zoellner v. St. Luke's Regional Medical Center*, --- F.Supp.2d ---, 2013 WL 1314079 (D. Idaho 2013), at *8, this Court determined whether a defendant utilized "wrongful means" when interfering with at-will employment

MEMORANDUM DECISION AND ORDER - 25

contract was a question of fact that could not be resolved in a motion to dismiss. In *Zoellner*, Dr. Patrick Zoellner ("Dr. Zoellner"), an anesthesiologist employed by Anesthesia Associates of Boise, brought antitrust and tortious interference claims against St. Luke's Regional Medical Center ("St. Luke's"). Anesthesia Associates of Boise was the exclusive provider of anesthesia services for St. Luke's. Dr. Zoellner alleged St. Luke's coerced Anesthesia Associates of Boise into terminating him by threatening not to renew the company's exclusive contract unless Dr. Zoellner was fired. *Id*. at *1. Although the Court determined Dr. Zoellner's tortious interference with contract and antitrust claims should be dismissed, it also found Dr. Zoellner stated a claim for interference with prospective economic advantage. *Id*. at *8. By alleging that St. Luke's pressured Anesthesia Associates of Boise to either terminate Dr. Zoellner or lose its exclusive contract with St. Luke's, Dr. Zoellner alleged a "plausible" basis for wrongful interference. *Id*. The Court similarly finds here that by alleging Defendants pressured Anesthesia Associates to either discontinue the relationship with RMMM or lose its exclusive contract with PMC, Plaintiffs have alleged a plausible basis for wrongful interference.[10] Defendants' motions to dismiss must accordingly be denied as to Count Three.

_____

10 "Wrongful means" can include conduct in violation of "(1) a statute or other

MEMORANDUM DECISION AND ORDER - 26

### B. Antitrust Claims

Count Four of the SAC allege Defendants' conduct constituted an unreasonable restraint of trade in violation of I.C. §48-104 and 15 U.S.C. §1.  (Dkt. 1-71, ¶53.)  Count Five alleges Defendants' conduct constituted an unlawful attempt to maintain PMC's monopoly over surgical services requiring the administration of general anesthesia in Bannock County, in violation of I.C. §48-105 and 15 U.S.C. §2.  (*Id*., ¶¶59-60.)  As an initial matter, the Court notes that although Plaintiff alleged only state antitrust claims in the FAC, the state court determined Plaintiffs' fourth and fifth causes of action were consistent with federal antitrust claims and construed them "in harmony with federal judicial interpretation of comparable federal antitrust statutes."  (Dkt. 1-31, p. 15) (*quoting* I.C. §48-102(3)).  The state court accordingly analyzed Plaintiffs' antitrust claims under the heightened federal pleading standards highlighted in *Twombly*, 550 U.S. 554 (2007), and *Iqbal*, 556 U.S. 662 (2009).[11]

---

regulation; (2) 'a recognized rule of common law, such as violence, threats of intimidation, deceit[,] misrepresentation, bribery, or disparaging falsehood', … or (3) 'an established standard of trade or profession."  *Quality Resource*, 706 F.Supp.2d at 1099 (internal citations omitted).  As the Court has already determined Plaintiffs' sufficiently alleged Defendants' interference was for an improper purpose, it need not reach whether Defendants also used wrongful means in interfering.  *Bliss*, 121 Idaho at 286 (to state a claim for interference with prospective economic expectancy, a plaintiff must allege *either* that defendant had an improper purpose to harm the plaintiff *or* that the defendant used wrongful means to cause injury to the prospective economic relationship).

60213.0002.5717306.1

The Idaho Supreme Court has characterized Idaho §§48-104 and 48-105 as antitrust statutes, and the Idaho legislature has directed that Idaho's antitrust statutes should be "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes."  I.C. § 48-102(3); *see also Pines Grazing Ass'n v. Flying Joseph Ranch*, LLC, 151 Idaho 924, 928 (2011).  The Court will accordingly consider Plaintiffs' state antitrust claims in conjunction with its consideration of Plaintiffs' federal antitrust claims.  *See also McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 811 n. 4 (9th Cir. 1988) (where plaintiffs base their state law claims on the same facts on which they base their Sherman Act claims, federal law is determinative of federal and state antitrust claims).

### 1.  *Antitrust Standing*

Plaintiffs' fourth cause of action alleges Defendants' conduct constituted an unreasonable restraint of trade in violation of §1 of the Sherman Act, which prohibits "any contract, combination in the form of trust or otherwise, or

---

[11] In several regards, the Court respectfully departs from the state court's analysis of Plaintiffs' antitrust claims.  However, interlocutory orders, such as the state court's ruling primarily denying the original Defendants' motion to dismiss, are interlocutory and "subject to reconsideration by the court at any time."  *Dessar v. Bank of America Nat'l Trust and Savings Association*, 353 F.2d 468, 470 (9th Cir. 1965).  It follows that upon removal, this Court may in its discretion depart from the state court's ruling on Defendants' motion to dismiss.  *Preseau v. Prudential Ins. Co. of America*, 591 F.2d 74, 79-80 (9th Cir. 1979).

60213.0002.5717306.1

conspiracy, in restraint of trade or commerce[.]"  15 U.S.C. § 1.  The elements of a

federal restraint of trade claim under the rule of reason standard[12] are:

> First, plaintiffs must plead facts which, if true, will prove (1) a contract,
> combination or conspiracy among two or more persons or distinct business
> entities; (2) by which the persons or entities intended to harm or restrain
> trade . . . (3) which actually injures competition.

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (internal
citations and quotations omitted).

Plaintiffs' fifth cause of action alleges unlawful monopoly in violation of § 2

of the Sherman Act.  The Ninth Circuit has stated the elements of a monopolization

claim are: "(a) the possession of monopoly power in the relevant market; (b) the

willful acquisition or maintenance of that power; and (c) causal 'antitrust injury.'"

*Cal. Computer Prods., Inc. v. Int'l Bus. Mach. Corp.*, 613 F.2d 727, 735 (9th Cir.

1979).

To state a claim for either a §1 or a §2 antitrust violation, a plaintiff must

adequately allege antitrust standing.  *Glen Holly Entertainment, Inc. v. Tektronix*

*Inc.*, 352 F.3d 367, 371 (9th Cir. 2003) (citations omitted).  To acquire "antitrust

---

[12] Federal courts analyze restraint of trade claims under either the rule of reason standard
or *per se* standard.  *Leegin Creative Leather Products, Inc., v. PSKS, Inc.*, 551 U.S.
877, 885 (2007).  The rule of reason standard is the favored approach and was the
standard applied by the state court.  (Dkt. 1-31, p. 17.)  As the *per se* rule is "confined
to restraints . . . that would always or almost always tend to restrict competition and
decrease output," a *per se* prohibition is not justified unless a restraint has "manifestly
anticompetitive" effects, and "lack[s] . . . any redeeming virtue."  *Leegin*, 551 U.S. at
886 (internal citations and quotations omitted).  The Court agrees with the state court
that a rule of reason standard is the appropriate standard in this case.

60213.0002.5717306.1

standing," a plaintiff must adequately allege and eventually prove "antitrust injury." *Id.* at 371 (citation omitted).  An antitrust injury is defined "not merely as injury caused by an antitrust violation, but more restrictively as 'injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (*quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  The elements of antitrust injury are: (1) unlawful conduct, (2) causing an injury to plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.  *American Ad. Mgmt., Inc. v. Gen. Telephone Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999).

Further, to establish antitrust injury, the injured party must be a "participant in the same market as the alleged malefactors."  *Glen Holly*, 352 F.3d 367, 372 (*quoting Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985)).  RMMM's restraint of trade and monopoly claims must fail because RMMM, a medical management and billing company, is neither a consumer of Defendants' surgical services nor a participant in the market for surgical services.[13]  *Id.*

---

[13] As Plaintiffs note, there is a narrow exception to the market participant requirement for parties who injuries are "inextricably intertwined with the injury the conspirators sought to inflict."  (Dkt. 28, p. 11) (*citing Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484-85 (1982)).  However, the plaintiff in *McCready*, unlike RMMM, was a consumer in the affected market.  The injury she suffered, suppressed competition in

60213.0002.5717306.1

Antitrust injury "requires the plaintiff to have suffered its injury in the market where competition is being restrained.  Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."[14]  *American Ad Mgmt.,* 190 F.3d at 1057; *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983) (emphasizing "the central interest [of the Sherman Act] in protecting the economic freedom of participants in the relevant market.").  Because RMMM has not suffered injury in the surgical services market, the market where competition is allegedly being restrained, RMMM lacks antitrust standing and must be dismissed from counts four and five.[15]

Elquist, however, is a potential participant in the surgical services market.  Although the FAC lacked any allegations suggesting injury to competition, the SAC states that Defendants' conduct would "preclude quality competition by

_____

the psychotherapy market and the corresponding cost of such suppression, was a direct result of the act alleged to be in violation of the antitrust laws.  By contrast, RMMM's alleged loss, its contract with Anesthesia Associates to provide medical management services, has no effect on competition.

[15]The state court dismissed Plaintiffs' restraint of trade claim in its entirety because neither Plaintiff adequately alleged Defendants' conduct caused an injury to competition.  As such, the court determined Plaintiffs lacked antitrust standing to bring a §1 claim.  (Dkt. 1-31, pp. 17-20.)  However, in so holding, the court did not address Defendants' argument that RMMM lacked standing to bring either a restraint of trade or a monopoly claim because it is not a participant in the relevant market.

60213.0002.5717306.1

Plaintiffs that would have proved a more-efficient and less-costly outpatient surgical alternative to patients and physicians in the community." (Dkt. 1-71, ¶60.) At this stage of the proceedings, it is reasonable to infer that seeking to eliminate any competing surgery center in a county with only one surgical center could leave consumers with less-efficient and more-costly access to surgical care. *Associated General*, 459 U.S. at 528 (coercive activity that prevents its victims from making free choice between market alternatives is inherently destructive of competitive conditions). To survive a motion to dismiss, Elquist is not required to present evidence to prove his allegations but must simply plead plausible facts in support of his claim. The Court finds Elquist has plausibly alleged injury to competition. However, Elquist's antitrust claims still must fail because the SAC fails to define the relevant market and fails to allege that PMC has market power in that market.

In order to state a valid claim under the Sherman Act, "a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market*." Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008). The "relevant market" and "market power" requirements "apply identically" under sections 1 and 2 of the Sherman Act. *Id.* For purposes of this opinion, therefore, there is no need to distinguish or

60213.0002.5717306.1

differentiate between count four and count five; the SAC's market allegations are either sufficient or insufficient for both claims.  *Id.*

"Monopolization claims can only be evaluated with reference to properly defined geographic and product markets." *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999).  A "geographic market extends to the area of effective competition where buyers can turn for alternative sources of supply.  The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (internal quotation and citation omitted).  To define the relevant market, the SAC alleges PMC is the exclusive provider of general-anesthesia capable surgical facilities in Pocatello and Bannock County, Idaho; that PMC is the only hospital located in Pocatello and Bannock County, Idaho; that PMC has the "power to determine who uses its surgical facilities, when the surgical facilities are used, the equipment and support personnel which is available for surgery, and the charges to patients of the doctors, dentists and podiatrists that use the surgical facilities;" and that Defendants' wrongful conduct represented an attempt to maintain PMC's monopoly position over surgical services requiring general anesthesia in Bannock County.  (Dkt. 1-71, ¶¶56-59).

60213.0002.5717306.1

Plaintiffs thus define the geographic market as Bannock County, Idaho, and the product market as surgical services requiring general anesthesia. Neither of these "markets" is appropriately defined for antitrust purposes, even at this stage of the proceedings.  First, the SAC fails to allege that Bannock County is the "area of effective competition" in which patients seeking surgical services can find alternative sources of supply.  *Big Bear*, 182 F.3d at 1105 (plaintiff's complaint identifying Big Bear Valley as the relevant market failed as a matter of law where plaintiffs did not allege that "Big Bear Valley is the area of effective competition in which buyers of these products can find alternative sources of supply.").  In fact, though they omitted the allegation in the SAC, Plaintiffs maintained, in the FAC, that doctors, dentists, and podiatrists refer patients to surgery centers and hospitals other than PMC because of their dissatisfaction with PMC.  (Dkt. 1-24, ¶61.)   This allegation suggests that the relevant geographic market extends beyond Bannock County.

Second, the SAC fails to identify an appropriately defined product market. The SAC does not contain any allegations regarding surgical centers located in neighboring counties or towns, nor identify whether or not the services provided by such centers are interchangeable with those provided at PMC.  For instance, the SAC does not allege that surgical facilities located in Blackfoot or Idaho Falls are not interchangeable with the services offered at PMC, nor even acknowledge that

60213.0002.5717306.1

such facilities exist. By attempting to restrict the relevant market to Bannock County without any explanation of why other neighboring surgical facilities do not compete, Plaintiffs have failed to identify a relevant market for antitrust purposes. *Tanaka* 252 F.3d at 1065. Failure to identify the relevant market is a proper ground for dismissing counts four and five of the SAC. *Id*., at 1063 ; *see also Newcal*, 513 F.3d at 1045 (a complaint "may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable."); *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc*., 875 F.2d 1369, 1373 (9th Cir. 1989) (defining the relevant market is indispensable to a monopolization claim).

Finally, Plaintiffs do not allege that PMC had market power in the relevant market. Existence of market power is an essential ingredient in a case in which plaintiff seeks to show violation of § 1 of the Sherman Act under the rule of reason analysis. *Hahn v. Oregon Physicians' Service*, 868 F.2d 1022, 1027 (9th Cir. 1988). Similarly, in order to state a valid claim under § 2 of the Sherman Act, a plaintiff must allege both that a "relevant market" exists and that the defendant has power within that market. *Newcal*, 513 F.3d at 1043. Market power is "'the power to control prices or exclude competition.'" *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). The SAC fails to state a claim under the Sherman Act because it does not allege, even in a conclusory

60213.0002.5717306.1

fashion, that PMC has market power or that PMC has the power to control prices or exclude competition.

Plaintiffs suggest that, under *Newcal*, 513 F.3d at 1045, "relevant market" need not be alleged with particularity and that whether a "relevant market" exists is generally a factual question for the jury.  (Dkt. 28, pp. 14-15.)  Judge Dunn so held in denying the original Defendants motion to dismiss count five.  (Dkt. 1-31, p. 21.)  However, the Court in *Newcal* held that the *actual existence* of a submarket within a geographic market is a factual question, and the *actual existence* of market power within an alleged relevant market is a factual question, assuming such markets are adequately alleged.  *Newcal*, 513 F.3d at 1051.  Plaintiff in *Newcal*, unlike here, adequately identified and defined the relevant market, and adequately alleged defendant possessed market power in that market.  The SAC, by contrast, fails to allege PMC possessed market power, and fails to adequately define the relevant market.  Counts four and five must accordingly be dismissed, though Elquist will be granted leave to amend.

Finally, Defendants argue Elquist's monopoly claim should be dismissed for failure to establish a plausible link between the alleged exclusionary conduct and the alleged injury to competition, and because Elquist was not ready to enter the market when the alleged conspiracy to derail the surgery center was executed, and thus lacks antitrust standing.  (Dkt. 4-1, p. 13.)  The Court rejects such arguments,

60213.0002.5717306.1

though it need not reach them given its dismissal of counts four and five on alternative grounds.  First, the SAC alleges that Stephens and Abreu warned Elquist that they were going to stop the surgery center, and that neither he nor his family members could operate both RMMM and the surgery center.  In addition, Anesthesia Associates advised Elquist that they were being pressured by Defendants to condition their continued relationship with RMMM on Elquist's assurances that he would abandon his pursuit of the surgery center.  Anesthesia Associates eventually terminated the Management Services Contract because Elquist refused to cease his plans to develop the surgery center, and Elquist alleges that the surgery center has been delayed in opening or will not open as a result.  It is not difficult to infer that Defendants' conduct damaged Elquist to the extent that he was unable to move forward with the surgery center.  The Court finds Elquist adequately plead causation.

Second, although only "a 'nascent business'—one that is merely a gleam in the eye and a hope in the heart of its promoters—does not possess the property to which antitrust injury can be done," Elquist's plans to develop the surgery center were beyond a mere "gleam in the eye" or "hope in the heart."  *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 711 (9th Cir. 2003) (citation omitted).  The SAC alleges that Elquist had "commitments from doctors, dentists, and podiatrists to participate in the development of a surgery center," and that the response to his

MEMORANDUM DECISION AND ORDER - 37

idea of developing a surgery was "overwhelmingly favorable."  (Dkt. 1-71, ¶¶17,

38.)  Moreover, Elquist owned and operated a successful surgery center in the past

(as evidenced by PMC's purchase of RMSC), and thus had experience developing

and ultimately selling a surgery center in Pocatello.  At the motion to dismiss

stage, Elquist is not required to present evidence of his preparedness to compete,

but must only make plausible allegations to establish he was ready to compete.

The Court finds the aforementioned statements are sufficient to support Elquist's

pleadings of antitrust injury.

### C.  The Newly Added Defendants

In the SAC, Plaintiffs seek to add seven corporate defendants merely by

alleging that PMC is a "joint venture" between LHP Hospital Group and the

Portneuf Health Care Foundation, and that PMC is "operated, managed, and

directed by a variety of inter-related legal entities from a variety of locations inside

and outside of Idaho."  (Dkt. 1-71, ¶2.)  The SAC also alleges that Stephens and

Abreu are employed by LHP Management Services, LLC, and makes general

allegations as to the ownership of the various newly added Defendants.  (*Id*.)

However, Plaintiffs do not identify any actions the newly added Defendants took,

do not provide any factual allegations to suggest the newly added Defendants

joined or participated in the alleged conspiracy against Plaintiffs, and do not

properly plead an agency relationship that would give rise to vicarious liability.

Plaintiffs have failed to provide any factual allegations to suggest that the newly

MEMORANDUM DECISION AND ORDER - 38

added Defendants participated—either directly or indirectly—in the alleged

wrongful conduct by the original Defendants.  As the SAC does not allow the

reader "to figure out why each corporate entity has been named as a defendant, or

what its connection to the underlying scheme is," the newly added Defendants

must accordingly be dismissed from this action.  *See generally*, *In re Fresh and*

*Process Potatoes Antitrust Litigation*, 834 F.Supp.2d 1141, 1166 (D. Idaho 2011).


## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

1.   Defendants' Motions to Dismiss Plaintiffs' Second Amended Complaint

    (Dkts. 4, 16, 25) are **GRANTED IN PART AND DENIED IN PART**.

    Plaintiffs' tortious interference with contract claim is **DISMISSED**

    **WITH PREJUDICE**.  Elquist's unreasonable restraint of trade claim is

    **DISMISSED WITHOUT PREJUDICE**.  RMMM's unreasonable

    restraint of trade claim is **DISMISSED WITH PREJUDICE**.  Elquist's

    monopoly claim is **DISMISSED WITHOUT PREJUDICE**.  RMMM's

    monopoly claim is **DISMISSED WITH PREJUDICE**.  Further, the

    newly added defendants, Portneuf Health Care Foundation, Inc., LHP

    Management Services, LLC, Pocatello Hospital, LLC, Pocatello Health

    System, LLC, Pocatello Health Services, LLC, LHP Pocatello, LLC, and

MEMORANDUM DECISION AND ORDER - 39

LHP Hospital Partners, Inc. are **DISMISSED WITHOUT PREJUDICE** from this action.  The original Defendants Norman Stephens, John Abreu and LHP Hospital Group remain in this action.  Finally, Defendants' motions to dismiss Plaintiffs' interference with prospective economic advantage claims are **DENIED**.

2. Defendants' Motion to Strike Plaintiffs' supplemental memorandum regarding LHP Hospital Partners, Inc. (Dkt. 32) is **MOOT**.

3. Pursuant to this Court's April 3, 2013 order, Defendants have twenty-one days from the date of entry of this order to respond to non-party Skyline's Motion to Quash (Dkt. 7).

DATED: September 30, 2013

Edward J. Lodge
United States District Judge

60213.0002.5717306.1